UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SANJAY BHATNAGAR,

          Plaintiff,

    v.

UNITED STATES OF AMERICA,

          Defendant.

Case No.  14-cv-00327-MEJ

**ORDER RE: MOTION FOR SUMMARY JUDGMENT**

Re: Dkt. No. 90

## INTRODUCTION

Pending before the Court is Defendant United States of America's (the "Government") Motion for Summary Judgment.  *See* Mot., Dkt. No. 90.  Plaintiff Sanjay Bhatnagar ("Plaintiff") filed an Opposition (Dkt. No. 91) and Defendant filed a Reply (Dkt. No. 96).  The Court heard oral argument on February 2, 2017.  Having considered the parties' positions, the relevant legal authority, and the record in this case, the Court **DENIES** the Government's Motion for the following reasons.

## BACKGROUND[1]

### A.     The Accident

On the morning of November 14, 2009, Plaintiff was riding his bicycle westbound on West Pacific Avenue in the Presidio park area in San Francisco.  Plaintiff had taken that same route on West Pacific Avenue many times before.  Around 11:30 a.m., Plaintiff approached an area near the Julius Kahn Playground (the "Playground"), where he encountered a newly installed speed

---

[1] The parties do not dispute the facts underlying Plaintiff's accident.  This background section mostly is reproduced from the Court's Order denying the Government's Motion to Dismiss the Second Amended Complaint (Mot. to Dismiss Order, Dkt. No. 60).

United States District Court
Northern District of California

bump. Unlike many other speed bumps in the Presidio, this was a Traffic Logix Model Speed cushion, a rubberized speed bump attached to the road with bolts, rather than a concrete speed bump built into the road. There was a one-inch step on the leading edge of the speed bump. There was no curb at that part of the road, 28 inches between the right edge of the speed bump and the edge of the road, and a 7-inch drop from the edge of the pavement to a downslope. Signage advised users of the road that the speed limit for the bump was 20 miles per hour. Based on eye-witness testimony, Plaintiff was traveling at or below the advised speed limit.

When Plaintiff rode over the speed bump, he lost control of his bike, fell, and landed on his face, head, and side. He suffered severe injuries: he fractured his cervical and thoracic spine, which required surgery to fuse four vertebrae; and suffered cuts and bruises to his face and head; and had to receive stitches on his face and lip. As a result of his injuries, Plaintiff has been declared permanently disabled and has not been able to return to work.

**B.     Administrative Proceedings**

On December 10, 2010, Plaintiff retained the Dolan Law Firm to represent him in filing an administrative tort claim against the Government for his injuries. When Plaintiff sufficiently recovered from his injuries, he worked with the Dolan Law Firm to develop his case, speaking with his attorney on a weekly basis. Plaintiff testified there were no circumstances that limited his ability to work with his lawyers in 2011.

Although the Dolan Law Firm sent the administrative claim to a number of federal agencies over a period of four months, the Dolan Law Firm did not timely file an administrative claim with the proper federal agency—the Presidio Trust (the "Trust"). *See* Mot. to Dismiss Order at 2-4. It is undisputed the Trust did not receive a copy of Bhatnagar's administrative claim until after the two-year deadline for filing such a claim. *Id.*

**C.     Relevant Procedural Background**

After the Dolan Law Firm stopped representing Plaintiff, Plaintiff initiated this action pro se. The Government moved to dismiss his complaint for failure to comply with the claim presentation requirement of the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2672, et seq. The Court granted the Motion. *See* Dkt. No. 46. Plaintiff was appointed counsel (Dkt. No. 31), who

1 filed a Second Amended Complaint ("SAC," Dkt. No. 54).  The Government again moved to

2 dismiss based on Plaintiff's failure to timely file an administrative claim with the Trust.  The

3 Court held Plaintiff's claim was not timely filed, but found based on the facts alleged in the SAC

4 that equitable tolling applied, and Plaintiff could proceed with his lawsuit.  *See generally* Mot. to

5 Dismiss Order.

6       The parties have conducted discovery, including retaining expert witness who have

7 analyzed the site of the accident.  The Government now moves for summary judgment.

8                                   **LEGAL STANDARD**

9       Summary judgment is proper where the pleadings, discovery and affidavits demonstrate

10 that there is "no genuine dispute as to any material fact and [that] the movant is entitled to

11 judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The party moving for summary judgment

12 bears the initial burden of identifying those portions of the pleadings, discovery and affidavits that

13 demonstrate the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S.

14 317, 323 (1986).  Material facts are those that may affect the outcome of the case.  *Anderson v.*

15 *Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute as to a material fact is genuine if there is

16 sufficient evidence for a reasonable jury to return a verdict for the nonmoving party.  *Id.*

17       Where the moving party will have the burden of proof on an issue at trial, it must

18 affirmatively demonstrate that no reasonable trier of fact could find other than for the moving

19 party.  *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007).  On an issue where

20 the nonmoving party will bear the burden of proof at trial, the moving party can prevail merely by

21 pointing out to the district court that there is an absence of evidence to support the nonmoving

22 party's case.  *Celotex*, 477 U.S. at 324-25.

23       If the moving party meets its initial burden, the opposing party must then set forth specific

24 facts showing that there is some genuine issue for trial in order to defeat the motion.  Fed. R. Civ.

25 P. 56(c)(1); *Anderson*, 477 U.S. at 250.  All reasonable inferences must be drawn in the light most

26 favorable to the nonmoving party.  *Olsen v. Idaho State Bd. of Med.*, 363 F.3d 916, 922 (9th Cir.

27 2004).  However, it is not the task of the Court to scour the record in search of a genuine issue of

28 triable fact.  *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996).  The Court "rel[ies] on the

United States District Court
Northern District of California

3

1   nonmoving party to identify with reasonable particularity the evidence that precludes summary

2   judgment." *Id.*; *see also Simmons v. Navajo Cty., Ariz.*, 609 F.3d 1011, 1017 (9th Cir. 2010).

3   Thus, "[t]he district court need not examine the entire file for evidence establishing a genuine

4   issue of fact, where the evidence is not set forth in the opposing papers with adequate references

5   so that it could conveniently be found." *Carmen v. S.F. Unified Sch. Dist.*, 237 F.3d 1026, 1031

6   (9th Cir. 2001).  If the nonmoving party fails to make this showing, "the moving party is entitled

7   to a judgment as a matter of law." *Celotex*, 477 U.S. at 322 (internal quotations omitted).

8           Additionally, at the summary judgment stage, parties must set out facts they will be able to

9   prove at trial.  At this stage, courts "do not focus on the admissibility of the evidence's form . . . .

10  [but] instead focus on the admissibility of its contents." *Fraser v. Goodale*, 342 F.3d 1032, 1036

11  (9th Cir. 2003) (citation omitted).  "While the evidence presented at the summary judgment stage

12  does not yet need to be in a form that would be admissible at trial, the proponent must set out facts

13  that it will be able to prove through admissible evidence." *Norse v. City of Santa Cruz*, 629 F.3d

14  966, 973 (9th Cir. 2010) (citations omitted).  Accordingly, "[t]o survive summary judgment, a

15  party does not necessarily have to produce evidence in a form that would be admissible at trial, as

16  long as the party satisfies the requirements of Federal Rules of Civil Procedure 56." *Block v. City*

17  *of L.A.*, 253 F.3d 410, 418-19 (9th Cir. 2001); *Celotex*, 477 U.S. at 324 (a party need not "produce

18  evidence in a form that would be admissible at trial in order to avoid summary judgment."); *see*

19  *also* Fed. R. Civ. P. 56(c)(4) ("An affidavit or declaration used to support or oppose a motion must

20  be made on personal knowledge, set out facts that would be admissible in evidence, and show that

21  the affiant or declarant is competent to testify on the matters stated.").

## DISCUSSION

23          The Government moves for summary judgment on two grounds.  First, it argues the

24  design, placement, and signage of the speed cushion are protected by the FTCA's discretionary

25  function exception.  Second, it revisits its previous argument that Plaintiff's claims are barred for

26  failure to timely file his claim with the Trust.

27          The Court addresses each argument in turn.

28  //

**A.** **The Discretionary Function Exception Does Not Bar Plaintiff's Claims**

1. <u>The Discretionary Function Exception</u>

The FTCA provides a limited waiver of the Government's sovereign immunity for damages for personal injury caused by the negligent or wrongful act or omission of any employee of a federal agency while acting within the scope of her office or employment, under circumstances where the Government, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred. *See* 28 U.S.C. § 2672. But the waiver of sovereign immunity does not apply to claims "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." 28 U.S.C. § 2680(a). This "discretionary function exception" to the FTCA's waiver of sovereign immunity is designed to "prevent judicial second guessing of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort." *United States v. Gaubert*, 499 U.S. 315, 322 (1991) (citation and quotation marks omitted). Where the Government proves the discretionary function exception applies, no federal subject matter jurisdiction exists. *See Prescott v. United States*, 973 F.2d 696, 702 (9th Cir. 1992) (Government bears burden); *Lesoeur v. United States*, 21 F.3d 965, 967 (9th Cir. 1994) (no jurisdiction where exception applies).

To determine whether the discretionary function exception applies, the Court "must first identify Plaintiff['s] specific allegations of agency wrongdoing, as determining the precise action the government took or failed to take . . . is a necessary predicate to determining whether the government had discretion to take that action." *Young v. United States*, 769 F.3d 1047, 1053 (9th Cir. 2014) (internal quotation and citation omitted). Each claimed wrongful act must be considered separately. *See In re Glacier Bay*, 71 F.3d 1447, 1451 (9th Cir. 1995).

For each claimed wrongful act, the Government must prove two elements. First, that the act or decision being challenged involves "an element of judgment or choice" by the government. *Berkovitz v. United States*, 486 U.S. 531, 536 (1988) ("In examining the nature of the challenged conduct, a court must first consider whether the action is a matter of choice for the acting

United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1   employee.  This inquiry is mandated by the language of the exception; conduct cannot be

2   discretionary unless it involves an element of judgment or choice."); *Prescott v. United States*, 973

3   F.2d 696, 702 (9th Cir. 1992) (government bears burden of proving discretionary function

4   exception applies).  If "a federal statute, regulation, or policy specifically prescribes a course of

5   action for an employee to follow[,]" the discretionary function exception does not apply; however,

6   a general rule or policy does not preclude the exception.  *Berkovitz*, 486 U.S. at 536.  Second, the

7   Government must prove the act or decision must be "based on considerations of public policy."

8   *Terbush v. United States*, 516 F.3d 1125, 1129 (9th Cir. 2008).

9         The Court first examines whether a triable issue of fact exists that the design, location, and

10   signage for the speed cushion were the product of judgment or choice, then turns to the whether

11   the Trust's decisions with respect to each of these elements were based on considerations of public

12   policy.

13         2.   <u>Element of Judgment or Choice</u>

14         The Government sets forth evidence that there is no federal statute, regulation or policy

15   that clearly dictates a particular conduct on the use of traffic control devices or signage in the

16   Presidio.  The Presidio Trust Act provides that the Trust "shall manage . . . maintenance,

17   rehabilitation, repair and improvement" of the property under its jurisdiction, fulfilling "the dual

18   statutory purposes of preserving the historic and natural character of the" park and making it

19   "financially self-sustaining."  *Presidio Historical Ass'n v. Presidio Tr.*, 811 F.3d 1154, 1157 (9th

20   Cir. 2016).  The Trust adopted the Presidio Management Trust Plan, part of which addresses park

21   land use, transportation, and infrastructure.  *See* Marshall Decl. ¶ 16 & Ex. B ("Management

22   Plan") at Executive Summary and Preface, Dkt. No. 90-1.  The Management Plan also identifies

23   general goals and policy priorities, such as "improv[ing] pedestrian and bicycle routes to promote

24   convenient, safe, and enjoyable walking and bicycling throughout the park" and "pursu[ing] traffic

25   safety improvements and look for ways to reduce traffic congestion."  Management Plan at 2837-

26   38.  The Management Plan specifically contemplates the Trust may utilize "traffic calming

27   measures" to improve roads and intersections.  *Id*. at 2838.  While the Management Plan identifies

28   a number of goals and policy priorities, it does not set out "mandatory and specific directives"

United States District Court
Northern District of California

6

relating to bicycle routes or traffic calming measures to which the Trust has "no rightful option but to adhere." *Terbush*, 516 F.3d at 1131 (citation omitted).

In an effort to rebut the Government's showing that there are no mandatory and specific directives governing the Trust's selection and installation of traffic calming measures, Plaintiff argues the Trust designated West Pacific Avenue as a "Class III Bikeway" in its Trails and Bikeways Master Plan. *See* Opp'n at 7 (citing Kropp Decl., Ex. I at 42, Dkt. No. 93). Plaintiff argues a "Class III Bikeway" is a type of roadway defined by the California Streets and Highways Code ("California Streets Code") § 890.6 and the California Highway Design Manual (the "Manual") § 1001.4. *See* Opp'n at 8. Pursuant to these authorities, a "Class III Bikeway" is a roadway used "primarily" for bicycle travel but shared with motorists, and it must conform to certain minimum standards for roadway engineering. *Id.* Plaintiff argues the Trust's decision to designate the road where he was injured as a "Class III Bikeway" divested the Trust of discretion to take actions antithetical to a road designated primarily for bicycle travel. *See* Opp'n at 7-10. But Plaintiff offers no evidence to support his argument that the Bikeways Master Plan defines "Class III Bikeway" in the same manner as it is defined in the California Streets Code or the Manual. *Cf.* Opp'n at 8-9 (arguing[2] Marshall testified her engineering judgment about where to place speed cushion was "guided" by the Manual and that she understood West Pacific Avenue was designated as Class III bike route).

In fact, the Bikeways Master Plan does not define "Class III Bikeway" as it is defined in the Manual, and does not define it as a roadway used primarily for bicycle travel. Instead, the Bikeways Master Plan describes Class III Bikeways as "[s]hared routes (auto and bicycle) on service roads and low volume roadways[,]" with pavement surfaces that may be upgraded, and of no applicable road width. *See* Reply Marshall Decl., Ex. A ("Bikeways Master Plan") at ECF pp. 17-18, Dkt. No. 96-1; *see also id.* at ECF p. 34 ("Class III is a shared roadway, not a bike lane"); *id.* at ECF p. 38 ("Class III bikeways indicate a signed bike route where bikes and cars share a lane."). The Bikeways Master Plan explains that on "[s]hared roadway (Class III bike routes) . . .

---

[2] Plaintiff does not attach the portions of Marshall's deposition testimony to which he refers in connection with this argument.

United States District Court
Northern District of California

1    bicyclists and motorists can share the road without marked bike lanes and/or shoulders. . . .  In

2    these cases, the roadway would be signed as a bike route.  Signage per [the American Association

3    of State Highway and Transportation Officials ("AASHTO")] guidelines or state motor vehicle

4    code would notify motorists that bicyclists are allowed the full use of the lane.  Other traffic

5    calming measures will be provided where feasible."  *Id*. at ECF p. 40.  Thus, there is no evidence

6    that, as a designated Class III bike route, West Pacific Avenue was intended "primarily" for

7    bicycle travel.

8            There also is no evidence that the Bikeways Master Plan incorporates the Manual's or the

9    California Streets Code's design requirements.  On the contrary, Amy Marshall, the Trust's

10   Transportation Manager, confirms that the Bikeways Master Plan did not adopt the

11   recommendations of the Manual or the California Streets Code on which the Manual is based.  *See*

12   Marshall Decl. ¶ 1; Reply Marshall Decl. ¶ 4; *see also id*. ¶ 5 (the "Trust has never adopted" either

13   the Manual or the California Streets Code on which it is based "in their entirety"; where the Trust

14   has adopted specific standards from the Manual, "it has done so expressly").  The Bikeways

15   Master Plan itself states that the "[b]ikeway classifications used in this plan are consistent with

16   federal guidelines (AASHTO 1999)" but because "many Presidio bikeways connect to bikeways

17   and bike routes outside the park[,] and to provide information in a context that is familiar to most

18   readers, the plan also identifies Caltrans bikeway classifications for each type of bikeway

19   (Caltrans 2001)."  Bikeways Master Plan at ECF p. 38; *see also id*. ("All bikeways proposed in

20   this plan would be designed to meet or exceed the minimum design standards (AASHTO

21   1999).").[3]  In sum, there is no evidence the Bikeways Master Plan adopted the Manual or

22   incorporated bikeway classifications from the Manual or the California Streets Code.

23           Based on the parties' evidence, it is undisputed the Trust had discretion in using and

24   deploying traffic calming measures on West Pacific Avenue and was not required to follow the

25   guidelines established by the Manual or the California Streets Code.  The Government has met its

26   burden of establishing the first prong of the *Berkovitz* test.

27

28   _____

[3] Plaintiff does not analyze AASHTO standards in his Opposition.  *See* Opp'n at 8 n.4.

United States District Court
Northern District of California

3.      Susceptible to Policy Analysis

"[O]nly those decisions grounded in social, economic, and political policy will be protected by the discretionary function exception."  *Soldano v. United States*, 453 F.3d 1140, 1145 (9th Cir. 2006) (quotation marks and citation omitted).  The agent need not actually have taken policy considerations into account in taking the challenged decision; the application of the exception depends instead "on the nature of the actions taken and on whether they are susceptible to policy analysis."  *Gaubert*, 499 U.S. at 325.  While "the distinction between protected and unprotected decisions can be difficult to apprehend, . . . governmental actions . . . fall along a spectrum, ranging from those totally divorced from the sphere of policy analysis, such as driving a car, to those fully grounded in regulatory policy, such as the regulation and oversight of a bank." *Soldano*, 453 F.3d at 1148 (quotation marks and citation omitted); *see also id*. (generally, "the *design* of a course of governmental action is shielded by the discretionary function exception, whereas the *implementation* of that course of action is not." (citation omitted; emphasis in original)).  If the conduct at issue "involves safety considerations under an established policy rather than the balancing of competing public policy considerations[,]" the discretionary function exception generally will not apply.  *Id*. (citation omitted).

Plaintiff contends the following specific acts or omissions by the Trust caused his injuries: (1) setting the advisory speed for passing over the speed cushion at 20 miles per hour; (2) choosing the Traffic Logix Model Speed cushion for the West Pacific Avenue location; (3) locating the speed cushion at the end of a long, straight, fairly steep downhill spot where the lane is not wide enough to allow bicyclists to go around the cushion; and (4) placing the warning sign too close to the cushion, and including an image of a pedestrian crossing rather than a speed bump. *See* Opp'n at 14-19.  The Court accordingly reviews the parties' evidence to determine whether a triable issue of fact exists that any of these decisions involved considerations of public policy, or whether they were "matters of scientific and professional judgment."

a.  Factors the Trust Balanced

In response to complaints in 2008 and 2009 about "cut-through" traffic in the Presidio and traffic speed and safety issues, the Trust implemented a traffic calming study (the "Study") to

1    evaluate traffic patterns and potential traffic calming measures.  Marshall Decl. ¶¶ 8-11.  The

2    Study was intended to prioritize park users over the speed or convenience of traffic.  *Id*. ¶ 10.

3    Marshall designed and implemented the Study.  *Id*.; *see also id*., Ex. C at 1 (Screening Form).  In

4    designing the Study, Marshall took into account concerns "typical for any traffic engineering

5    project as well as concerns specific to the unique nature and character of the Presidio[;] . . .

6    includ[ing] pedestrian and traffic safety; motorist and cyclist convenience for both tenants and

7    visitors to the Presidio; access for emergency responders; potential environmental impacts; and

8    potential impacts on the historic fabric of the Presidio."  Marshall Decl. ¶ 12.  The speed cushion

9    at issue in this lawsuit was installed as part of the Study.  *Id*. ¶ 13.

10           Project proposals that are "not considered routine, minor or ongoing" must undergo a

11   multi-step review and approval process that includes environmental review under the National

12   Environment Policy Act and review under the National Historical Preservation Act of 1966; this is

13   colloquially known as "N-Squared" Review.  *Id*. ¶¶ 15-16.  In addition, the Trust must

14   demonstrate the project meets the purposes and requirements of the Trust's regulations, any

15   agreements between the Trust and other agencies, and the Management Plan.  *Id*. ¶ 17.  The Study

16   was submitted for N-Squared Review.  *Id*. ¶ 14.

17           Marshall selected the speed cushion model based on a number of factors, "including the

18   approach gradient and design speed of the device; motorist and bicycle safety, comfort, and

19   convenience; access for emergency responders; potential environmental impacts; and potential

20   impacts on the historic fabric of the Presidio."  Marshall Decl. ¶ 24; *see also* Marshall Reply Decl.

21   ¶¶ 11-12 (other factor considered is that narrower model facilitated emergency response vehicle

22   response and provided more room for cyclists to go around cushion).  In the Screening Form she

23   used to submit the Study for N-Squared Review, Marshall indicated traffic calming devices would

24   be installed; speed cushions can be straddled by emergency response vehicles; and the "speed

25   cushions planned to be installed . . . have a higher design speed (approximately 25 mph) compared

26   to those that have been installed on low-volume local or residential streets, which have a design

27   speed of approximately 15 mph."  Screening Form at 1; *see also* Marshall Decl. ¶ 22.  The

28   decision to use a speed cushion with a higher design speed "involved considering the site

United States District Court
Northern District of California

10

conditions and balancing the comfort and safety for traffic and pedestrians." Marshall Reply Decl. ¶ 7. Marshall decided to post an advisory speed of 20 miles per hour after balancing, among other things, the recommended design speed for the cushion, the comfort of motorists on West Pacific Avenue, the 25 miles per hour speed limit on West Pacific Avenue, and the comfort and safety of pedestrians near the playground entrance.

Marshall selected the speed cushion's location primarily to slow traffic around the Julius Kahn Playground area. Three of the four primary access points to the Playground already had slowing features: two had stop signs, and a third had an asphalt speed bump. Screening Form at 3. Marshall indicated "[t]he addition of speed cushions at the remaining entrance will slow traffic through this congested playground area." *Id.*; *see also* Marshall Decl. ¶ 23 ("One of the principal goals for the speed cushions at the West Pacific Avenue site was to improve safety by slowing traffic through what was then a congested area near a playground. The speed cushions were installed . . . near the pedestrian crossing visible in the photograph. [The] Playground is on the . . . right side of the photograph."). The Study was approved. Marshall Decl., Ex. E. When Marshall submitted the excavation clearance application for the speed cushions on West Pacific Avenue, she indicated they "will be installed in West Pacific just west of Laurel Street." *Id.*, Ex. F (Excavation Form). The Excavation Form and the map attached to it identify a general area wherein to place the speed cushions but do not pinpoint an exact location or require they be installed at the fourth primary access point to the playground. *See id.* Marshall could not recall any document instructing the Trust's work crew where exactly to place the speed cushions on West Pacific Avenue. *See* Kropp Decl., Ex. F (Marshall Dep.) at 165:5-166:9. Nevertheless, Marshall declares she directed the road crew to install the speed cushions "to the east of the pedestrian crosswalk and entrance to the ... Playground." Marshall Decl. ¶ 33. The factors she considered included the location of the crosswalk, park entrance, and parking at the site; pedestrian and traffic safety; motorist and cyclist safety and convenience; and emergency vehicle response time. *Id.*

Marshall also requested excavation clearance applications for signage relating to the speed cushions. *See* Marshall Decl., Ex. G. The application called for two post holes, "[b]oth located

United States District Court
Northern District of California

along West Pacific Ave. just west of Laurel St.  One to be placed on the north side of West Pacific Ave. and a second one on the south side West Pacific Ave."  *Id*. at ECF p. 252.  While Marshall does not specifically recall all the factors she considered in making the decision to install warning signs at those locations, she declares she took into consideration "the location of the speed cushions, the roadway alignment, any roadside vegetation that could affect visibility, the prevailing speed of traffic . . . the location of the pedestrian crosswalk, playground entrance, and parking at the site, pedestrian and traffic safety, and the impact on the environment and historic character of the park."  Marshall Decl. ¶ 34.  Subsequently, the Presidio sign shop supervisor, Pat Kaye, called Marshall to ask whether the warning sign on the north side of West Pacific Avenue could instead be installed on an existing pole on that side of the street, or whether the sign shop should install a second pole.  *Id*. ¶ 35.  Marshall instructed Kaye to use the existing pole based on her consideration of a number of factors, including the location of the existing pole, its distance from the speed cushions and crosswalk, roadway alignment, site visibility, the fact that all the warning signs reinforced the same intended behavior of slowing down at the playground entrance, prevailing speed of traffic, the location of the playground entrance, pedestrian and traffic safety, and the impact on the environment and historic character of the park.  *Id*.  Marshall testified Kaye called her and said "something to the effect of . . . 'there's an existing sign post right here in the same area, the pedestrian and playground sign.  Can we use that post?'"  *See* Marshall Dep. at 147:15-148:10.  Marshall said Kaye could.  *Id*.

The Government does not identify the specific National Park or Trust policies that guided Marshall in her identification of relevant factors.  The Management Plan and the Bikeways Master Plan list some goals, commitments, and policies, but these are not clearly related to the majority of the factors Marshall identified in her Declarations.  *See* Management Plan at ECF pp. 41-42 (articulating "commitments"), p. 47 (articulating "General Objectives of GMPA"), p.48 ("Land Use Policies"), pp. 70-74 (listing Trust's goals for Scenic and Recreational Resources); Bikeways Master Plan at ECF pp. 28-31 (five principal goals are: (1) enhance public use, access and experience; (2) support resource preservation; (3) contribute to a comprehensive transportation strategy; (4) provide for sustainable design and construction; (5) promote ongoing public

United States District Court
Northern District of California

involvement through volunteer stewardship), p. 29 (listing objectives of first goal of enhancing

public use, including improving bikeways to minimize potential for conflicts between pedestrians,

bicyclists and cars; promote safety and security; and improve access to views), p. 30 (listing

objectives of comprehensive transportation strategy).

b.    Analysis

A triable issue of fact exists as to whether the Trust's decisions surrounding the speed

cushions were made based on considerations of public policy or on considerations of safety and

engineering.  For example, "[s]etting a safe speed limit . . . is essentially a matter of scientific and

professional judgment, and matters of scientific and professional judgment—particularly

judgments concerning safety—are rarely considered to be susceptible to social, economic, or

political policy." *Soldano*, 453 F.3d at 1148.  The Ninth Circuit also repeatedly has held that the

decision not to use warning signs to signal known dangers for which the acting agency is

responsible "is not the kind of broader social, economic or political policy decision that the

discretionary function exception is intended to protect." *Oberson v. U.S. Dep't of Ag.*, 514 F.3d

989, 998 (9th Cir. 2008) (citation omitted).  These authorities suggest Marshall's decisions

regarding the recommended speed limit and the location and type of signage for the cushions are

"matters of scientific and professional judgment" that are not susceptible to policy analysis.

*Buchwald v. Metropolitan Transportation Commission*, 2005 WL 2000931 (N.D. Cal.

Aug. 16, 2005), is directly on point.  In *Buchwald*, a cyclist was injured when riding over a raised

intersection in the Marin Headlands.  The Park Service had installed the intersection to slow

traffic, subsequently built it higher because the impact of the initial height was insufficient to slow

traffic, and then decided to lower it because cars bottomed out on the intersection.  The plaintiff

was injured before the Park Service was able to lower the intersection, and he contended the

intersection was "dangerously steep . . . without adequate warning." *Id*. at *5.  The court found

the discretionary function exception did not apply:  "the extent to which an approach to a raised

intersection is gradual or abrupt is simply not a decision that is subject to social, political, or

public policy concerns, and therefore not the type of conduct Congress sought to protect in

enacting the discretionary function exception." *Id*.  The court also was "not persuaded" that the

United States District Court
Northern District of California

1   decision to place a warning sign approximately 98 feet before the intersection involved the

2   balancing of competing policy concerns.  *Id.*

3        The Government attempts to distinguish *Buchwald* on the ground that case dealt with a

4   "construction issue," while this case deals with a design issue.  Reply at 9.  But the Government

5   has not shown that the challenged features of the speed hump (e.g., its rise), its placement, or its

6   associated signage were integral to the design of the roadway or the Study.  This being the case,

7   the Court finds the challenged features are closer to implementation than design.

8        As in *Buchwald*, based on the evidence presented at summary judgment, the Court is not

9   persuaded that the Trust's decisions with respect to the type of speed bump, advisory speed,

10  location and signage involved the balancing of competing policy concerns.  Marshall describes a

11  myriad of *factors* she considered in making her decisions; however, she does not identify the

12  competing Trust *policies* she weighed in reaching her decision or explain how she balanced those

13  policies with respect to the challenged features of the speed bump.  The cases the Government

14  cites illustrate the distinction between factors relevant to decision-making and policy

15  considerations.

16       For example, in *ARA Leisure Services v. United States*, 831 F.2d 193, 195 (9th Cir. 1987),

17  the Ninth Circuit found the Park Service's decision to build Denali Park Road without guardrails

18  was grounded in social and political policy after the government had shown "a clear link between

19  this decision and Park Service policies requiring that roads be designed to be esthetically pleasing

20  and to lie lightly upon the land using natural support wherever possible." *Id*. (citations and

21  internal quotation marks omitted).  The failure to maintain those roads in a safe condition,

22  however, was not so grounded: "there is no clear link between Park Service road policies and the

23  condition of [the road], which had eroded [significantly] at the accident site and which had edges

24  so soft as to be dangerous." *Id*.  Thus, the court found the park's failure to maintain the roads was

25  not protected by the discretionary function exception.  *Id*.

26       In *Loye v. United States*, 2001 WL 4841604 (E.D. Cal. Oct. 12, 2011), a hiker fell from

27  steps at Yosemite National Park.  The steep steps led to an overlook; they were not built to code,

28  lacked handrails, had a confusing rise and run, and were bordered by jagged boulders.  The

14

government argued the discretionary function exception applied to different aspects of the design of the stairs because the 1916 Organic Act mandated the preservation of the scenery and the natural and historic objects and mandated they should be "le[ft] . . . unimpaired for the enjoyment of future generations." *Id*. at *11.  No accessibility guidelines applied to the steps because of safety concerns, and because the steps led to an area that was not designed or created to be accessible.  *Id*. at *4, *11.  The design decisions balanced the goals of maintaining the view in its natural setting, "including trail connection steps consistent with the granite surroundings, and visitor access and safety."  *Id*. at *11.  The decision to omit handrails also balanced safety with the preservation of Yosemite's natural beauty.  *Id*.  The design of the steps—including the rise and run that the plaintiff challenged—was "designed to conform and blend with and not obstruct the existing natural terrain. . . design difficulties [arose] from the terrain's 'naturally dropping off on a slope."  *Id*.; *see also id*. at *3 (designing steps with rise and run that met with code meant the steps would have to be carried out further:  "If we changed the rise and run—say we reduced the rise, we would have to carry the steps out and the ground kept falling.  So we'd have to get out here a lot further which means it was more impairment of the view again the further we carried it." (internal quotation marks omitted)); *id*. (rise of steps high enough to make connection with existing trail without protruding out).  On appeal, the Ninth Circuit found the decisions to build trail steps with that particular rise-and-run and not install handrails were "plainly rooted in policy because [they] balanced competing considerations of safety and accessibility against a need to preserve Yosemite's natural terrain and panoramic views."  *Loye v. United States*, 502 Fed. App'x 695, 696 (9th Cir. 2012).

In *Childers v. United States*, 841 F. Supp. 1001 (D. Mont. 1993), winter hikers slipped on an unmaintained trail in Yellowstone National Park ("YNP") and sued the government.  The Park Service introduced evidence that decisions about safety measures in national parks required the consideration of myriad public policy factors, including cost, feasibility and aesthetics.  The Park Service issued guidelines to help carry out its missions, including the Ranger Operating Procedure ("ROP") for trail closures.  The Yellowstone ROP instructed rangers that

Closing  or  restricting  access  to  any  area  of  YNP  is  a  serious

> management/operational decision. *On one hand we must protect visitors and the resource from injury or damage and we must also allow maximum possible use access for the people to their Park . . .* Not having an area closed, with proper signing and notification, could lead to serious death or injury to visitors/employees or could cause serious resource impact, i.e., removal of bears. *On the other hand, having an area closed that is closed because someone forgot to open it, or look at it to see if it should be open, causes a credibility problem with visitors, park management, congressmen, etc.* Do not underestimate the political sensitivity of closing or restricting access to any area of the park. However, we must protect the people and the park.

*id*. at 1009 (quoting YNP ROP; emphasis added in original); *see also id*. ("The ROP requires the Park Service to consider many factors before it closes a trail, including visitor safety and visitor access"). Other Park Service documents also identified competing policies. *Id*. The end goals of these policies were to make YNP "reasonably safe" and to "adequately warn[]" visitors of hazards. *Id*. The plaintiffs' allegations implicated the Park Service's decisions relating to the treatment of unmaintained trails during the winter, and whether those trails should be close or warning signs should have been installed. *Id*. at 1013-14. A district ranger testified about his decision-making process when he decided not to close the trail:

> He rejected a recommendation to close the trail for the winter because he believed that such a decision would improperly limit the public's access to a unique area of Yellowstone. He also analyzed visitor safety issues, concluding that winter conditions along the trail did not present an unusual danger to visitors. The ultimate decision to keep the trail open, but to discourage its use by removing trailhead identification signs and not listing it on winter maps, attempted to balance these competing concerns.

*Id*. at 1016. The district court concluded that these were the types of choices that should be protected from judicial "second guessing" because they were the product of policy-based decisions about how best to balance the competing concerns of keeping the Park open during the winter, and visitor safety." *Id*. at 1014. The Ninth Circuit affirmed the district court's conclusion the discretionary function exception applied: "Park rangers used their discretion to balance, within the constraints of the resources available to them, a statutory mandate to provide access with the goal of public safety. This decision was precisely the kind the discretionary function exception was intended to immunize [the government] from suit." *Childers v. United States*, 40 F.3d 973, 975-6 (9th Cir. 1975).

16

It is undisputed the decisions to conduct the Study and install traffic calming devices generally are protected by the discretionary function exception.  But Plaintiff does not challenge those decisions; instead, he challenges specific installation decisions such as the model of the speed cushion, its location, and related signage.  Unlike the government's showing at the trial court level in *ARA*, *Loye* or *Childers*, the Government so far has not introduced detailed evidence regarding policy considerations that should (or did) surround the implementation of the speed humps on West Pacific Avenue.  The Government also does not clearly link the factors Marshall identifies in her Declarations to policies applicable to the Trust as they pertain to specific installation decisions.  *See* Mot. at 14-16; Reply at 6-13.  Although the Government may be able to establish those links at trial, the Court finds the Government has not met its burden on summary judgment of showing there is no triable issue that the Trust's decisions were susceptible to policy analysis.

## B.       Equitable Tolling

Plaintiff testified there were no circumstances in 2011 that limited his ability to work with his lawyer, and that he met with his attorneys weekly.  *See* Mot. at 18.  Based on this testimony, the Government argues "no extraordinary circumstances" beyond Plaintiff's control prevented a timely filing of his claims, and therefore equitable tolling did not apply.  The Government cites *Hunter v. Galaza*, 366 Fed. App'x 766 (9th Cir. 2010), to support its argument that the Dolan Law Firm's failure to timely file Plaintiff's claim constitutes mere negligence or professional malpractice.  *See* Mot. at 18.  But the Court finds more persuasive the case the *Hunter* Court uses to illustrate behavior that does rise to the level of egregious misconduct justifying tolling: *Spitsyn v. Moore*, 345 F.3d 796, 801 (9th Cir. 2003).  In *Spitsyn*, the petitioner hired counsel almost a year in advance of the statute of limitations, but counsel failed to prepare the petition or respond to numerous letters and phone calls from the petitioner and his mother, and withheld the petitioner's file for over two months after the limitations period expired.  The court found counsel's performance was so deficient it transcended merely negligent performance, and that under the facts of that case, equitable tolling applied: "The fact that the attorney retained by petitioner may have been responsible for the failure to file on a timely basis does not mean that petitioner can

United States District Court
Northern District of California

1   never justify relief by equitable tolling.  *As a discretionary doctrine that turns on the facts and*

2   *circumstances of a particular case, equitable tolling does not lend itself to bright-line rules*."

3   *Spitsyn*, 345 F.3d at 801 (emphasis added).

4          Plaintiff retained the Dolan Law Firm as soon as he was well enough to do so, and almost a

5   year before the deadline for filing his claim.  *See* Bhatnagar Decl. ¶¶ 4-5, Dkt. No. 92.  He hired

6   that firm because of its reputation in pursuing personal injury lawsuits and experience in filing suit

7   against the Government.  *Id*. ¶ 5.  He relied completely on his counsel to pursue his claims, and

8   did not know where or when the Dolan Law Firm sent his claims form.  *Id*. ¶ 7.  When the Dolan

9   Law Firm informed Plaintiff it did not want to represent him further and sent him his case file, the

10  file "contained letters showing when they had submitted my claim.  [Plaintiff] understood from the

11  Dolan Law Firm that they had submitted [his] claim and the next step was to wait and see if the

12  Presidio Trust granted or denied [his] claim."  *Id*. ¶ 8.  Those letters show the Dolan Law Firm

13  waited seven months to start sending claims forms after Plaintiff retained it, and continued sending

14  claims forms (to the wrong federal agencies) until the statutory deadline in November 2011.  *See*

15  SAC, Exs. A-D, Dkt. No. 54-1.  The Presidio Trust did not receive Plaintiff's claim until

16  December 14, 2011—a month after the statutory deadline.  *Id*., Ex. F (claim denial letter).

17         There is no suggestion that Plaintiff in any way contributed to his attorneys' failure to

18  timely submit a claim, was aware of his counsel's difficulties in filing his claims, or should have

19  been aware of his counsel's failures to do so until the Trust denied his claim in November 2013.

20  *Cf. Harris v. Carter*, 515 F.3d 1051, 1055 (9th Cir. 2008) (equitable tolling typically denied where

21  party's own mistake contributed to missed deadline); *Kwai Fun Wong v. Beebe*, 732 F.3d 1030,

22  1052 (9th Cir. 2013) ("[C]entral to the [equitable tolling] analysis is whether the plaintiff was

23  without any fault' in pursuing his claim" (quotation marks and citation omitted)).  The Dolan Law

24  Firm's failure to timely and effectively submit claims on Plaintiff's behalf appears to be the type

25  of circumstances beyond the control of a litigant diligently trying to pursue his claims.  The Firm's

26  repeated failure to submit claims effectively, its failure to communicate with Plaintiff about the

27  situation, its failure to explain it had missed the statutory deadline, and its decision to stop

28  representing Plaintiff after that mistake, is not "mere negligence."  Under these circumstances, the

United States District Court
Northern District of California

18

United States District Court
Northern District of California

Court sees no reason to revisit its prior ruling finding that equitable tolling applies under these circumstances.

**CONCLUSION**

Based on the analysis above, the Court hereby **DENIES** the Government's Motion for Summary Judgment.

The Court also stays pretrial deadlines and vacates the upcoming pretrial conference scheduled for April 6, 2017.  The Court sets a Case Management Conference to be held on March 23, 2017 at 10:00 a.m. in Courtroom B at 450 Golden Gate Avenue, San Francisco, California to refer the parties to a further settlement conference with a magistrate judge and reset trial deadlines. The parties may file a Joint Case Management Conference Statement addressing (1) Settlement and ADR; (2) Narrowing of Issues for Trial; (3) Scheduling; and (4) any other issues the parties believe will secure the just, speedy, and inexpensive resolution of this action.

The Court will separately enter an order regarding Plaintiff's request for a jury trial.

**IT IS SO ORDERED.**

Dated: February 23, 2017

_____
MARIA-ELENA JAMES
United States Magistrate Judge